IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN MOZDZIERZ | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 06-2652 |
| AETNA LIFE INSURANCE COMPANY | : | |

**MEMORANDUM**

**SURRICK, J.**                                    **DECEMBER  17 , 2014**

    This action alleges improper termination of long-term disability benefits under a plan
governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001
*et seq*.  Presently before the Court are the cross Motions for Summary Judgment filed by
Plaintiff, Steven Mozdzierz (ECF No. 47), and Defendant, Aetna Life Insurance Company (ECF
No. 45). For the following reasons, Defendant's Motion will be granted and Plaintiff's Motion
will be denied.

**I.      BACKGROUND**

    Plaintiff, a computer programmer by trade, alleges that he is totally disabled and
incapable of performing the sedentary duties of a computer programmer because of lower spine
and leg pain.  After applying for, and initially receiving, benefits through a long-term disability
group coverage plan underwritten and administered by Defendant, Plaintiff's benefits were
terminated following a thorough review of his condition by Defendant.  Appearing *pro se*,
Plaintiff alleges the termination of his benefits was arbitrary and capricious.  He brings this
action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

**A.      Events Giving Rise to Plaintiff's Claim for Long-Term Disability Benefits**

Plaintiff became employed with Accenture, LLP in July 1999, as a software programmer. (Pl.'s First Am. Compl. ¶¶ 18-19, ECF No. 23-2.)  The job description for which he was hired included the tasks of "design, code/configure" computer software, and did not include any strenuous activity (*e.g.* lifting of heavy objects).  (Admin. R. 425, ECF No. 46.)[1]  In late 2000, Plaintiff presented at a hospital emergency department with complaints of pain in his lower spine and legs.  (*Id.* at 797.)  He was referred to orthopedist Michael J. Pushkarewicz, M.D. to address his complaints of spinal pain.  (*Id.* at 573.)

Dr. Pushkarewicz evaluated Plaintiff on January 11, 2001, at an office visit.  (*Id.* at 573-75.)  Plaintiff was thereafter scheduled for an invasive surgical procedure on his spinal column. The surgery was performed by Dr. Pushkarewicz on January 19, 2001.  (*Id.* at 567-69.)  Over the ensuing months, Plaintiff was treated by Dr. Pushkarewicz on an out-patient basis receiving continuing follow-up care.  (*Id.* at 539-65.)  During this period, no definitive diagnosis was given as to the cause of Plaintiff's spinal and leg pain.

Plaintiff took a leave of absence from Accenture on August 1, 2001, due to his continuing spinal and leg pain.  He returned to work on a part-time basis on September 17, 2001.  (*Id.* at 123.)  Around this time Dr. Pushkarewicz scheduled Plaintiff for a second surgical procedure, which was performed on October 4, 2001.  (*Id.* at 535-37.)  After a second leave of absence, Plaintiff returned to work on a part-time basis from November 1, 2001 through January 2, 2002. He began working on a full-time basis on January 3, 2002.  (*Id.* at 123.)

At all times material, as a benefit with his employment with Accenture, Plaintiff

---

[1] The entirety of the Administrative Record before Defendant is filed at ECF Nos. 46-1 through 46-10, and Bates labeled "Defendant 1" through "Defendant 1111."  We will use the Bates citations when referencing the Administrative Record, consistent with the citations contained within the Parties' respective Motions.

participated in a group coverage plan for long-term disability benefits underwritten by Defendant

(the "Plan").  (*Id*. at 1-75.)  As applied to Plaintiff, the Plan defines "disability" as follows:

> If your classification is below manager (or other equivalent position), you are
> considered Totally Disabled if your doctor and the Claims Administrator agree
> that you are unable to work at your own occupation for the first five years of the
> disability, and thereafter at any occupation for which you may be qualified,
> educated or trained.

(*Id*. at 5.)  Defendant is a named fiduciary in the Plan, and is expressly provided with

discretionary authority to "determine whether and to what extent employees and beneficiaries are

entitled to benefits."  (*Id*. at 52.)  According to the terms of the Plan, Defendant had "the right

and opportunity to examine any person who is the basis of any claim at all reasonable times

while the claim is pending."  (*Id*. at 72.)

**B.**      **Defendant's Handling of the Long-Term Disability Benefits Claim**

In January 2002, Plaintiff submitted a claim for long-term disability benefits through his

employer, Accenture, pursuant to the Plan.  (Admin. R. 424-34.)  Plaintiff contended that he was

unable to sit or drive for more than ten minutes, and that Accenture's attempt to accommodate

him, by permitting him to work from home, was ineffective.  (*Id*. at 426.)  On January 29, 2002,

Defendant requested that Plaintiff to have his treating physician complete an "Attending

Physician's Statement," and Defendant sought Plaintiff's treatment records, as part of its review

of the benefits claim.  (*Id*. at 428.)  Dr. Pushkarewicz completed the Statement on February 21,

2002.  He indicated a diagnosis of low back pain and a herniated disc in the lumbar spine.  He

further indicated that Plaintiff was capable of light activity and that Plaintiff could not drive

more than ten minutes, however "his job is not the problem."  (*Id*. at 736-37.)  On March 5,

2002, based upon Dr. Pushkarewicz's representations and records, Defendant initially approved

Plaintiff's disability benefits claim, for the time period October 30, 2001 through January 2,

2002.  (*Id*. at 423.)  Plaintiff was subsequently approved for long-term disability benefits on June 7, 2002.  (*Id*. at 421.)

Defendant continued to request updated medical records from Plaintiff's treating physicians and conducted regular reviews of the file.  (*Id*. at 136-56.)  On September 19, 2002, Defendant noted that the medical records did not suggest a work related disability, and that Plaintiff denied a history of trauma or prior back problems.  (*Id*. at 144.)  On October 31, 2002, Defendant was informed by Plaintiff that he submitted a claim for disability benefits through the Social Security Administration (SSA).  (*Id*. at 149, 154.)  Plaintiff's claim for disability benefits through SSA was later approved, with an effective date of September 1, 2002.[2]  (*Id*. at 167.)

During this time frame, Plaintiff's treating physicians remained unable to offer a definitive diagnosis as to the cause of Plaintiff's spinal and leg pain.  With regard to this inability to diagnose the cause of his pain, Plaintiff represents the following:

> I was very frustrated to say the least that no doctor seemed to be able to pinpoint the exact cause of my pain and a possible remedy for it.  Due to my extreme frustration with not knowing the exact reason why I was experiencing these problems, I decided to search the Internet to see if any answers turned up.  After a search on the Internet for "back problems and groin pain", [sic] I was directed to a document titled the adhesive arachnoiditis syndrome, written by Dr. Sara Smith MB, BS [].  After reading this document, it was clear to me that the symptoms I have been experiencing since 2001 had to be related to the etiology described in the document.

(Pl.'s Brf. in Supp. of Mot. 5, ECF No. 47) (internal citations omitted).  Plaintiff forwarded his on-line research to Dr. Pushkarewicz, who subsequently "gave validity to the information [Plaintiff] sent him."  (*Id*. at 6.)[3]  Dr. Pushkarewicz's office notes indicate that he believed

---

[2] The Record does not reflect the basis of SSA's determination of disability.

[3] Plaintiff represents that these events occurred in June 2005.  (Pl.'s Br. in Supp. of Mot. 6.)  However, based upon the inconstancies between this time frame, compared with the records of his treating physician, Dr. Pushkarewicz, and the Defendant's claim notes contained within the Administrative Record, it is not entirely clear if Plaintiff submitted this internet research to

Plaintiff had arachnoiditis as of September 19, 2002. (Admin. R. 585.) However, chart notes from subsequent office visits reflect that on March 3, 2003, Dr. Pushkarewicz was unsure as to the diagnosis of Plaintiff's condition, and on April 3, 2003, Dr. Pushkarewicz indicated that the alleged arachnoiditis was a mere possibility. (*Id*. at 595-97, 599.) Notwithstanding Dr. Pushkarewicz's reduced confidence in his initial diagnosis of arachnoiditis, Defendant noted this diagnosis based upon Dr. Pushkarewicz's September 19, 2002 office note. (*Id*. at 146, 155.)

Aside from Dr. Pushkarewicz, Plaintiff also sought treatment at Brandywine Hospital in the late 2002, early 2003 time frame. (*Id*. at 614-20.) Following a pain consultation visit on November 25, 2002, Sheng K. Lin, Ph.D., M.D. noted the impression of epidural fibrosis,[4] based upon a physical examination and objective findings on a prior MRI. (Admin. R. at 619-20.) The Brandywine Hospital records did not mention arachnoiditis, or Dr. Pushkarewicz's diagnosis of it.

Defendant continued to request that Plaintiff have his treating physician complete an "Attending Physician Statement" as part of its continuing review of the benefits claim. (*Id*. at 416.) Dr. Pushkarewicz completed the "Attending Physician Statements" on behalf of Plaintiff on May 9, 2002, October 20, 2002, February 14, 2003, and September 15, 2003. These "Attending Physician Statements" reflect the following: May 9, 2002—no diagnosis, "unable to sit for prolonged periods," capable of sedentary work, unknown date for return to work, (*id*. at 739-42); October 20, 2002—diagnosis of arachnoiditis, physical limitations of driving and

---

Dr. Pushkarewicz prior to the initial September 19, 2002 diagnosis, or subsequently when Dr. Pushkarewicz waivered on this diagnosis.

[4] Plaintiff places a great deal of emphasis on the internet article on arachnoiditis by Dr. Sara Smith, MB, BS and claims that it is authoritative. We note the article draws a distinction between arachnoiditis and epidural fibrosis, suggesting the former is a more severe condition. (Pl.'s Mot. Ex. "21.")

sitting, estimated return to work within six months, and "can return to previous occupation," (*id*. at 722-23); February 14, 2003—diagnosis of arachnoiditis, physical limitations same as before, no return to work expected, and "patient unable to tolerate commute," (*id*. at 719-20); and September 15, 2003—diagnosis of arachnoiditis, no ability to work, limitations of limited driving, and "patient cannot tolerate driving."  (*Id*. at 402-03.)

Defendant referred Plaintiff's file to a third-party vendor, Concentra, for an in-person medical assessment on April 9, 2003.  (*Id*. at 157.)  Concentra conducted its in-person medical assessment on April 18, 2003.  (*Id*. at 480-86.)  The Concentra nurse case manager concluded that an independent medical evaluation was in order, "to document medical status, treatment recommendations, and physical capabilities," due to Plaintiff's "expert computer skills and the fact that he mentioned he might be able to work from home with modification of his activity level."  (*Id*. at 486.)  Based upon the recommendations of the Concentra case manager, Defendant referred the file to an internal review by a registered nurse to determine the necessity of an independent medical evaluation.  (*Id*. at 173.)  The registered nurse reviewer concurred in this recommendation "to determine [Plaintiff's] functionality [and] if he has any work capacity."  (*Id*. at 175-76.)  An independent medical evaluation was then sought by a neurologist as of June 30, 2003.  (*Id*. at 178.)

Defendant attempted to schedule the independent medical evaluation over the ensuing months, but was hampered in its ability to do so by Plaintiff's alleged inability to drive more than ten minutes.  (*Id*. at 179, 181-83, 191, and 194.)  On October 31, 2003, Plaintiff presented for an independent medical evaluation, performed by board certified neurologist Seth Haplea, M.D.  (*Id*. at 787-93.)  Consistent with Dr. Pushkarewicz's wavering on the diagnosis of arachnoiditis, Dr. Haplea indicated that the reports of prior lumbar spine MRI's were negative for objective

findings associated with arachnoiditis, and that Plaintiff's reported symptoms were "inconsistent with his neurological examination." (*Id.* at 792-93.) While conceding that Plaintiff "may have some chronic residual low back and leg pain," Dr. Haplea noted that "*I do think that he is elaborating his symptoms to a significant extent*." (*Id.* at 793) (emphasis added). In Dr. Haplea's view, Plaintiff was not receiving proper pain management for his condition. (*Id.*) Dr. Haplea concluded that it was reasonable for Plaintiff to return to work, and recommended a functional capacity evaluation to "determine what his functional limitations may be and to what degree he may be elaborating his symptoms." (*Id.*) Defendant then conducted an internal review of Dr. Haplea's report by a registered nurse, who concurred with Dr. Haplea's recommendation for a functional capacity evaluation. (*Id.* at 202-05.)

Attempts were then made by Defendant to schedule a functional capacity evaluation, however difficulties again presented due to Plaintiff's claimed inability to drive more than ten minutes. (*Id.* at 213, 215, 218, and 223.) During this time period, Defendant was requesting updated medical records from Plaintiff's treatment providers. (*Id.* at 206, 208-9, and 214.) Defendant also noted  that, as of July 7, 2004, a Capabilities and Limitations Worksheet was mailed to Dr. Pushkarewicz for completion. (*Id.* at 220 and 224-25.) Dr. Pushkarewicz completed the Capabilities and Limitations Worksheet on July 16, 2004, indicating that Plaintiff was capable of sitting, standing, crawling, kneeling, lifting, pushing, pulling, reaching above the shoulder, forward reaching and, *working up to eight hours per day*. (*Id.* at 818) (emphasis added). Based upon this assessment by Dr. Pushkarewicz, Defendant decided to obtain additional medical records and transfer the file internally for further review. (*Id.* at 229-31.) That review included evaluation of treatment records from the Veteran's Administration Medical Center, Coatesville, (VAMC). (*Id.* at 1060-61.) Records from the VAMC included a February

6, 2004 chart notation that Plaintiff's alleged diagnosis of arachnoiditis was questionable.[5]  (*Id.* at 793.)  The Defendant's nurse reviewer seconded Dr. Haplea's recommendation for a functional capabilities evaluation.  (Admin. R. at 1061.)

At some point in 2004, Dr. Pushkarewicz merged his practice with a larger orthopedic group in Delaware, but continued to see Plaintiff.  (*Id.* at 622-36.)  Dr. Pushkarewicz indicated he wished to have the spinal specialist group at his new practice evaluate Plaintiff.  (*Id.* at 635.)  Plaintiff later presented to Dr. Pushkarewicz's specialist colleague, Bruce J. Rudin, M.D., with complaints of low back and groin pain.  (*Id.* at 997.)  Dr. Rudin ordered an MRI, and failed to indicate a diagnosis of arachnoiditis in his report.  (*Id.*)  The MRI ordered by Dr. Rudin suggested an impression of epidural fibrosis.  (*Id.* at 883.)  Plaintiff was seen by Dr. Rudin in follow-up on November 17, 2004 to review the MRI, and was told by Dr. Rudin during a lengthy conversation that there was no pathology to suggest a reason for his groin pain.  (*Id.* at 996.)  Dr. Rudin's chart notations are silent as to any suggestion that Plaintiff was disabled.

A functional capabilities evaluation was completed on April 19, 2005.  (*Id.* at 1046-48.)  The physical therapist administering the evaluation noted:

> During the [functional capabilities evaluation] the client refused, was unable, or unwilling to perform all material handling tests except unilateral carry on the left, which he was unable to complete due to reports of pain.  The client attempted kneeling, standing, walking, and sitting all of which he self-limited within 2 minutes due to reports of pain.  The client refused repeated reciprocal leg motion, unloaded repeated bending, ladder climbing, and stair climbing despite repeated encouragement.

---

[5] Defendant's internal nurse reviewer referenced Plaintiff seeking to transfer his care from the VAMC Coatesville to a separate facility due to his being questioned on his chronic opioid usage.  (Admin. R. 1060.)  Within the VAMC records, Plaintiff is noted to have called into the VAMC, becoming "belligerent and obnoxious and using foul language over the phone," wherein he demanded "you incompetent ignorant people fill [a] prescription [for Percocet] NOW," despite having filled a prescription for 100 Percocet the week prior.  (*Id.* at 795-97.)  The referenced VAMC records further indicate Plaintiff appeared on February 6, 2004, in the primary care clinic for follow-up care.  (*Id.* at 692-94.)

(*Id*. at 1047.)  Due to Plaintiff's performance, the physical therapist concluded that an accurate

level of functional capacity was not able to be completed.  (*Id*. at 1048.)

In light of Plaintiff's poor performance on the functional capability evaluation, and the

significant evidence, both from his treating physicians and Defendant's independent medical

reviewers, suggesting that Plaintiff may be exaggerating his condition, Defendant sought to

conduct surveillance of Plaintiff.  (*Id*. at 1039-40.)  Defendant engaged a third-party vendor to

perform the surveillance, which was conducted on May 29, 2005 through May 31, 2005.  (*Id*. at

1033-38.)  The activities depicted on the surveillance video are described as follows:

> During the surveillance CD, Mr. Mozdzierz was noted to be working around his
> yard.  He spent approximately one-half hour to 45 minutes working on a portable
> pathway on the pool area.  He was energetically raking several minutes, bending
> over frequently and frequently working in a bent over position.  Particularly
> remarkable was the effort, which he was extending while shoveling in a bent over
> position.  He was observed to have full use of, both, upper and lower extremities,
> freely moving his neck, having no gait disturbance.  He was observed performing
> heavy landscaping activities without difficulty.
>
> In the second statement of the surveillance, he was observed to be working on a
> channeling stent.  During this time frame, he was also noted to freely move and
> bend over and work in a bent position without difficulty. He was also observed to
> be conversing and joking with another individual, who appeared to be an
> acquaintance.

(*Id*. at 1004.)  The activities depicted on the surveillance were further detailed as follows:

> During the course of surveillance of your activities, you were observed walking,
> bending, squatting, lifting a garage door, setting up chicken wire, digging and
> raking.  You were observed to bend at a 90-degree angle as you used a shovel and
> a rake and performed various yard duties.
>
> You were noted to move in a free and unrestricted fashion with no assistive
> devices or sign of any restriction or limitation of motion.

(*Id*. at 1087.)  A copy of the disc containing the surveillance video is filed of record.  (Def.'s

Supp. to App'x – Admin. R., ECF No. 48.)  The Court has independently reviewed the

surveillance video in its entirety.  The above descriptions accurately describe Plaintiff's activities as shown on the video.  Plaintiff does not dispute that the surveillance video shows him engaged in the described activities.  (Pl.'s Resp. to Def.'s Mot. 2-3, ECF No. 49.)

Defendant sought further independent review of Plaintiff's treatment records and the previous reviews, in light of the surveillance video.  (Admin. R. 1004-05.)  A review dated October 11, 2005 was performed by a specialist in occupational, preventive, and family medicine, Robert D. Petrie, M.D.  (*Id.*)  Dr. Petrie opined that, viewed against the backdrop of the surveillance video, Plaintiff's "poor performance on the functional capacity evaluation *could only be viewed as a conscious effort to embellish and portray a false level of functional ability.*" (*Id.* at 1005) (emphasis added).  Noting that on the video Plaintiff "demonstrated an exceptional ability in working in very awkward positions, working in a bent over position, particularly while shoveling and vigorously raking," Dr. Petrie concluded as follows:

> Certainly, Mr. Plaintiff is capable of performing a sedentary occupation on a full time basis.  Once again, the activities, which her [*sic*] performed while working around his portable pool were consistent with a heavy labor type activity. Absolutely, he does possess the functional abilities to work full time on a sedentary basis if not considerably heavier.

(*Id.*)

After receipt of Dr. Petrie's report, Defendant terminated Plaintiff's long-term disability benefits because he no longer met the definition of "total disability" under the Plan.  (*Id.* at 301.) Detailed correspondence was sent by Defendant to Plaintiff, dated October 24, 2005, enumerating Defendant's reasons for termination of benefits.  (*Id.* at 1083-90.)  Defendant's termination letter indicated that, under the Plan, Plaintiff must not be able to perform his own occupation as a software developer, classified as a sedentary physical demands category.  (*Id.* at 1084.)  In reaching its decision, Defendant reviewed Plaintiff's treatment records from Dr.

Pushkarewicz, VMAC records, and Dr. Richard Stratchko, the independent medical examination performed by Dr. Haplea, the functional capacities evaluation, internal nurse reviews, Dr. Petrie's report, and the surveillance evidence.  (*Id*. at 1084-88.)  Based upon a review of these materials, Defendant concluded that Plaintiff retained the physical capacity to perform his own sedentary occupation, and therefore did not meet the definition of "total disability" under the Plan.  (*Id*. at 1089.)  The termination of benefits letter then detailed Plaintiff's rights to appeal the decision.  (*Id*. at 1089-90.)

### C.    Plaintiff's Appeal of the Termination of Benefits

Plaintiff filed an appeal on October 28, 2005, indicating that he would provide Defendant with more medical documentation supporting his claim of disability.  (Admin. R. 323-27.)  On October 31, 2005, Plaintiff submitted documentation to Defendant, which included information on arachnoiditis, a report interpreting an October 29, 2004 MRI of the lumbar spine, and a letter dated June 24, 2005 from Dr. Pushkarewicz.  (*Id*. at 329-31.)  In communication with Plaintiff, the appeal reviewer explained that, while the submitted information was helpful, current medical office records and MRI diagnostic testing results are preferred.  (*Id*. at 326.)  Plaintiff was afforded an additional twenty days to submit any additional information for his appeal.  (*Id*. at 324-25.)  Following the time period for the submission of additional information, Defendant sent the file for an independent review by Robert N. Anfield, M.D., board certified in family medicine and a specialist in occupational medicine.  (*Id*. at 343-44.)

A review of Plaintiff's file was performed by Dr. Anfield on December 2, 2005.  (*Id*. at 829-31).  Dr. Anfield noted that the records from Dr. Pushkarewicz's and Dr. Haplea's examinations were consistent in "demonstrating minimal physical findings, no neurological deficits, and no loss of muscle mass or strength."  (*Id*. at 830.)  The surveillance video was noted

to be the "best evidence of Mr. Mozdzierz's functional abilities," and the activities depicted thereon were "not consonant with the abilities Mr. Mozdzierz demonstrated in the [functional capacity evaluation]." (*Id*.) Furthermore, the activity level of Plaintiff shown in the surveillance demonstrated that Plaintiff "is motivated to be active," and "[t]hat he is functional even in the face of his perceived pain." (*Id*. at 831.) Dr. Anfield indicated that the available records do not support Dr. Pushkarewicz's "diagnostic hypothesis" of arachnoiditis based upon objective findings, and further, that notwithstanding a conclusive diagnosis, "neither arachnoiditis nor complaints of chronic pain preclude activity including work." (*Id*.) After a complete review of the available records, Dr. Anfield concluded that Plaintiff is able to perform the sedentary level work of his occupation as a computer programmer. (*Id*. at 831.)

During this time period, Plaintiff also independently sought medical review of his condition by neurologist, Lucas Z. Margolies, M.D. (Pl.'s Br. in Supp. of Mot. 8.) Dr. Margolies examined Plaintiff on November 10, 2005, and issued a written report to Plaintiff's primary care physician, Robert Stratchko, M.D. (Pl.'s Mot. Ex. 63.)[6] Based upon his examination of Plaintiff, Dr. Margolies offered the following opinion:

> Despite Mr. Mozdzierz [sic] complaints, his examination was essentially normal. There was no evidence to suggest a significant central or peripheral nervous system disorder. Other than a mildly reduced ankle jerk on the right, there was no other objective evidence to support his symptoms including muscle atrophy, weakness, sensory loss or abnormal reflexes. Mr. Mozdzierz indicated that he is trying to acquire disability benefits because of his chronic symptoms. Although he may be limited from physical activity due to subjective pain caused by strenuous activity, I see no reason why he cannot go back to his previous job working with computers.

(Pl.'s Mot. Ex. 63.) It is not clear from the record that Plaintiff submitted a copy of Dr. Margolies' November 10, 2005 report to Defendant in support of his disability benefits claim.

---

[6] The Exhibits to Plaintiff's Motion for Summary Judgment are not filed electronically with the Court's CM/ECF system, but rather filed in hard copy with the Clerk.

Following Dr. Anfield's review, Defendant determined that the decision to terminate benefits was appropriate.  (Admin. R. 825-27.)  Defendant forwarded correspondence dated December 13, 2005 to Plaintiff, detailing its reasons for affirming the termination of benefits. (*Id.*)  Based upon the medical records, and the independent reviews, including Dr. Anfield's review, Defendant concluded "that there was no medical documentation in [Plaintiff's] file that continued to support [his] inability to perform [his] own occupation."  (*Id.* at 827.)  After receiving notice of the rejected appeal, Plaintiff submitted additional medical records to Defendant on January 8, 2006, specifically including a May 26, 2005 evaluation from James P. Argires, M.D.  (*Id.* at 835-38.)  In the May 26, 2005 report, Dr. Argires indicated an impression of lumbar laminectomy failure syndrome.  This is the third diagnosis to be offered to Plaintiff concerning his condition.  (*Id.*)  Dr. Argires did not offer any opinion suggesting that Plaintiff is totally disabled.

Defendant reviewed the additional records submitted by Plaintiff, and sent correspondence, dated January 17, 2006, stating that although "ERISA does not recognize second appeals," it had "reviewed this information on reconsideration."  (*Id.* at 840.)  In the January 17, 2006 letter, Defendant recognized that while Plaintiff may have pain, "there is no evidence to support [Plaintiff's] inability to do sedentary work."  (*Id.*)  Defendant maintained that the prior decision to terminate benefits was correct.  (*Id.*)  Plaintiff was also advised that no further review would be conducted by Defendant, as Plaintiff had exhausted his appeal rights pursuant to ERISA.  (*Id.*)

### D.    Procedural History

Plaintiff began this action *pro se* on June 19, 2006, by filing a Motion to Proceed *In Forma Pauperis*, indicating that this action presented a question concerning Title V of the

Americans with Disabilities Act of 1990, 42 U.S.C. § 12201 *et seq.* (Pl.'s Mot. to Proceed *In Forma Pauperis*, ECF No. 1.) We denied Plaintiff's Motion by Order dated July 5, 2006 (ECF No. 2), and subsequently denied reconsideration by Order dated July 17, 2006. (ECF No. 4.) After being ordered to file a complaint or suffer dismissal of the action, Plaintiff filed a Complaint on August 7, 2006. (Pl.'s Compl., ECF No. 7.) Counsel for Defendant consented to a Rule 4 waiver of service on January 2, 2007. (Waiver of Service, ECF No. 10.) An Initial Pre-trial Conference was held on May 9, 2007. Thereafter, we entered an Order directing the Clerk to appoint an attorney to represent Plaintiff, due to the complexities of an ERISA action and Plaintiff's *pro se* status. The case was placed in civil suspense pending appointment of counsel. (ECF No. 18.) By Order dated November 1, 2007 (ECF No. 20), this case was removed from civil suspense. Attorney Marc S. Bragg, Esquire was appointed as counsel for Plaintiff by Order entered November 8, 2007. (ECF No. 22.)

A Motion to join Plaintiff's former employer, Accenture, as a Defendant to this action was filed on December 3, 2007, along with an Amended Complaint. (ECF Nos. 23, 23-2.) By Order dated December 14, 2007, Plaintiff's Motion was granted as unopposed. (ECF No. 26.) Accenture and Aetna thereafter filed Motions to Dismiss Plaintiff's Complaint. (ECF Nos. 27, 28.) On November 1, 2010, after receiving Plaintiff's responses to the pending Motions (ECF Nos. 31 and 32), we filed a Memorandum and Order granting Accenture's Motion dismissing it from this action, and granting, in part, Defendant's Motion. (ECF No. 36.) Following adjudication of the Defendants' Motions, all that remained at issue was Plaintiff's claim under Section 502(a)(1)(B) of ERISA against Defendant. The record reflects that Plaintiff took no affirmative steps to prosecute this claim further in the ensuing time frame.

Sometime thereafter, Attorney Bragg advised this Court that he was moving to California

and would no longer be practicing law in this jurisdiction. On March 30, 2012, an Order was entered permitting Attorney Bragg to withdraw as counsel, and requiring Plaintiff to notify in writing his intention to either pursue this claim or abandon it. (ECF No. 40.) A status conference was held on May 18, 2012. At the Conference, Plaintiff was ordered to file with the Court and provide Defendant with all medical documentation that Plaintiff contended should have been a part of the Administrative Record before Defendant but was not. (ECF No. 42.) As of September 27, 2012, Plaintiff had failed to comply with this Order. (Def.'s Mot. Ex. 1.) On October 1, 2012, Plaintiff advised the Court that he wished to proceed in this litigation by conducting additional discovery "for summary judgment by the [C]ourt." (Def.'s Mot. Ex. 2.)

Plaintiff failed to pursue his claim in any manner over the next twenty-one months. An Order was entered on July 21, 2014, requiring the Parties to file a dispositive motion on or before August 29, 2014. (ECF No. 44.) Defendant filed its Motion for Summary Judgment on September 3, 2014 (ECF No. 45), and Plaintiff filed his Motion for Summary Judgment on September 8, 2014. (ECF No. 47.) Plaintiff and Defendant filed timely responses to the respective Motions. (ECF Nos. 49, 50.)

## II.    LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing

the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact is genuinely ... disputed must support the assertion by ... citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 5574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matshshita*, 475 U.S. at 587 (citations omitted).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  Courts must not resolve factual disputes or make credibility determinations.  *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d. Cir. 1995).

When a court is faced with cross-motions for summary judgment, "[t]he rule is no different."  *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).  "Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."  *Id*. (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

### III.    DISCUSSION

Plaintiff brings this action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C.

§ 1132(a)(1)(B), challenging Defendant's decision to terminate his long-term disability benefits.

We have jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

### A.    Standard Governing a Challenge Pursuant to Section 502(a)(1)(B) of ERISA

"ERISA was enacted to promote the interests of employees and their beneficiaries in

employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber*

*Co. v. Bruch*, 489 U.S. 101, 113 (1989) (citation omitted).  Following a denial or termination of

benefits, an ERISA benefits plan participant may bring a claim in District Court to recover

benefits allegedly due him under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B); *Miller v.*

*American Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011).  Where a plan expressly vests the

administrator with discretionary authority to determine eligibility for benefits, as is the case here,

an arbitrary and capricious standard of review is employed in the Section 502(a)(1)(B) challenge.

*Miller*, 632 F.3d at 846; *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-16 (2008);

*Firestone Tire & Rubber Co.*, 489 U.S. at 115.  The arbitrary and capricious standard of review

is identical to an abuse of discretion standard of review.  *Miller*, 632 F.3d at 846 n.2 (citing

*Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010)).

"An administrator's decision is arbitrary and capricious 'if it is 'without reason,

unsupported by substantial evidence or erroneous as a matter of law.'''"  *Id.* at 845 (citation

omitted).  A plan administrator's decision "is supported by 'substantial evidence if there is

sufficient evidence for a reasonable person to agree with the decision.'"  *Courson v. Bert Bell*

*NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000) (citation omitted).  This standard of

review is "highly deferential" to the decision of the plan administrator.  *Id.*  The scope of review

is narrow, and "[a] reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Lucash v. Strick Corp.*, 602 F. Supp. 430, 434 (E.D. Pa. 1984) (citing *Bowman Trans., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

### B.  Support for Defendant's Termination of Benefits

Plaintiff argues that Defendant's termination of his long-term disability benefits is arbitrary and capricious.  We disagree.

Defendant's decision to terminate benefits was based upon its conclusion that Plaintiff failed to meet the definition of "totally disabled" under the Plan, that is that Plaintiff was not able to perform his own sedentary occupation as a computer programmer.[7]  (Admin. R. 1089.)  In order for Defendant to have acted arbitrarily and capriciously, Plaintiff must establish that the Record does not contain substantial evidence to support Defendant's conclusion.  We are satisfied that Defendant's conclusion has more than sufficient support in the records of Plaintiff's treating physicians, the separate reviews conducted internally and independently at the request of Defendant, and in the very revealing surveillance video of Plaintiff.  In fact, when one views the surveillance video, it is patently obvious that Plaintiff's claims that he cannot drive to work, that he is totally disabled, and incapable of performing the sedentary duties of a computer programmer have no merit.

### 1.  The Records of Plaintiff's Treating Physicians

Plaintiff's diagnosis of arachnoiditis by Dr. Pushkarewicz is open to serious question when weighed against the entire Record.  A review of the records of Plaintiff's treating

---

[7] The Plan requires a claimant to establish a disability from working one's "own occupation" for the first five years of disability benefits, and thereafter requires a claimant to establish a disability from working "any occupation" for which the claimant may qualify. (Admin. R. 5.)  Plaintiff's claim falls within the "own occupation" category.

physicians supports Plaintiff's representations to Defendant (*id*. at 832), and to this Court (Pl.'s Br. in Supp. of Mot. 5-6), that his treating physicians were unable to diagnose the cause of his subjective pain.  Dr. Pushkarewicz was the only physician to arrive at a diagnosis of arachnoiditis.  His "diagnosis," however, cannot be considered to be anything more than a mere hypothesis.[8]  The MRI report dated November 25, 2002, suggested epidural fibrosis.  (Admin. R. 619-20).  Dr. Lin concurred with that impression.  (*Id*.)  A subsequent MRI dated October 29, 2004, also suggested epidural fibrosis.  (*Id*. at 883.)  Dr. Argires' report indicates an impression of lumbar laminectomy failure syndrome.  (*Id*. at 835-38.)  And, Dr. Pushkarewicz's subsequent records indicate that he was not certain as to a diagnosis of arachnoiditis, and was merely offering a hypothesis.  Moreover, the VAMC records noted that the diagnosis of arachnoiditis was questionable.  (*Id*. at 693.)  In light of the fact that the diagnosis of arachnoiditis was apparently the product of independent on-line research performed by Plaintiff himself, *ante* at 4, and considering the conflicting diagnoses offered by the other treatment providers, Defendant cannot be said to have abused its discretion in concluding that Dr. Pushkarewicz's diagnosis of arachnoiditis was not supported in the record.

Defendant also justifiably rejected Dr. Pushkarewicz's diagnosis that Plaintiff was totally disabled.  Dr. Pushkarewicz was the only physician to offer the opinion that Plaintiff was totally disabled.  Significantly, his colleagues, Dr. Rudin and Dr. Argires, did not offer any opinion as to Plaintiff being disabled in their reports detailing their examinations.  Indeed, Dr. Pushkarewicz raised questions with regard to his opinion of disability when he indicated on July 16, 2004, that

---

[8] *Compare* "diagnosis," defined as "the determination of a medical condition (such as a disease) by physical examination or by study of its symptoms," *with* "hypothesis," defined as "a supposition based on evidence but not proven; a proposed explanation, supported by evidence, that serves as a starting point for investigation."  *Black's Law Dictionary* 518, 811 (9th ed. 2009).

Plaintiff was capable of working up to eight hours per day.  Moreover, in Dr. Pushkarewicz's view, arachnoiditis cannot be said to be a complete limitation on working, because on October 20, 2002, Dr. Pushkarewicz represented to Defendant that, notwithstanding a diagnosis of arachnoiditis, Plaintiff could return to his prior occupation.  (*Id*. at 722-23.)  This is, coincidentally, an opinion which Defendant's independent reviewer, Dr. Anfield, also offers.

The primary reason why Plaintiff is said to be limited in performing his own occupation is an alleged inability to drive more than ten minutes.  Dr. Pushkarewicz's records suggest that he never felt Plaintiff was limited in performing his own occupation, but rather he could not drive to work.  *See, e.g.*, *id*. at 736-37 ("[H]is job is not the problem."); *id*. at 719-20 ("[P]atient unable to tolerate commute."; and *Id*. at 402-03 ("[P]atient cannot tolerate driving.").  Indeed, Plaintiff himself represented to Defendant that the reason he was prevented from working was due to being "unable to drive."  (*Id*. at 1068.)  However, even if one were to accept this limitation, Accenture accommodated the limitation by permitting Plaintiff to work from home. In light of this accommodation, it cannot be said that driving was a requirement of Plaintiff's occupation, and therefore Plaintiff was not prevented from working his sedentary occupation as a computer programmer.  As to Plaintiff's claimed limitation on sitting for prolonged periods, Plaintiff does not suggest that the tasks of a computer programmer require one to spend the entire workday sitting in a chair.  Clearly, this job can be accomplished by standing for certain periods—an activity Plaintiff is clearly capable of.[9]  Dr. Pushkarewicz clearly endorsed this common sense view when he represented to Defendant that a diagnosis of arachnoiditis did not prevent Plaintiff from working (Admin. R. at 722-23), and that as of July 2004, Plaintiff was

---

[9] Many specialists today suggest that standing during the work day vastly improves health benefits to workers.  Pronk NP, Katz AS, *et al.*, *Reducing Occupational Sitting Time and Improving Worker Health: The Take-a-Stand Project, 2011*, 9 Preventing Chronic Disease (Oct. 11, 2012), http://www.cdc.gov/pcd/issues/2012/pdf/11_0323.pdf.

capable of working up to eight hours per day.  (*Id.* at 818.)  Based upon the foregoing, Plaintiff's alleged limitations do not support a finding of "total disability," or the inability to perform his own occupation, as per the Plan.

Moreover, Plaintiff's subjective complaints of pain do not constitute *prima facie* evidence of a total disability.  Certainly, debilitating pain *may* constitute a disability.  *Eppley v. Provident Life and Acc. Ins. Co.*, 789 F. Supp. 2d 546, 572 (E.D. Pa. 2011).  However, "where claims as to the existence or degree of subjective pain are unsubstantiated, the plan administrator has the discretion to disregard them."  *Id.* (citations omitted).  Given the conflicting diagnoses offered by Plaintiff's various treating physicians, the conflicting suggestion of disability by Dr. Pushkarewicz, the total lack of any suggestion of disability by the other physicians, and considering the surveillance video, the Record here does not support a claim of disability based upon Plaintiff's subjective complaints of pain.

### 2.       The Independent Investigation by Defendant

Notwithstanding the fact that Defendant was not required to give any special deference to the opinions of Plaintiff's treating physicians, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), the opinions presented by the treating physicians provided Defendant with justification to seek, and rely upon, the opinions of independent specialists.  Defendant did just that in obtaining an in-home nurse consultation, which led to an independent medical evaluation by board certified neurologist, Dr. Haplea, which then led to an in-person functional capacity evaluation by a physical therapist.  In addition, Defendant sought review of Plaintiff's records, in light of the surveillance video, by independent physician Dr. Petrie.  Following Plaintiff's appeal of Defendant's initial termination decision, Defendant obtained further independent review by Dr. Anfield.  Both Dr. Haplea and Dr. Anfield addressed the diagnosis of arachnoiditis and the

reasons why, in their respective opinions, such a diagnosis was not clinically indicated in light of

Plaintiff's subjective complaints, objective findings, and diagnostic imaging.  Drs. Haplea,

Petrie, and Anfield also concurred that there was no evidence to suggest that Plaintiff was not

capable of performing his sedentary occupation of computer programmer.  In fact, Dr. Haplea

actually suggested that Plaintiff was exaggerating his condition.

When this record is viewed in its entirety, it is apparent that Dr. Pushkarewicz's

hypothesis of arachnoiditis, and suggestion that Plaintiff is incapable of performing his sedentary

occupation, stands alone.  None of Plaintiff's treatment records—Dr. Rudin, Dr. Argries, the

VAMC records, and MRI reports—support either Dr. Pushkarewicz's diagnostic hypothesis or

his conclusion of Plaintiff's inability to perform a sedentary occupation.  On the other hand, the

conclusions of Defendant's consultant physicians find ample support in objective evidence,

namely, their in-person examination, diagnostic imaging, and the surveillance video.  *See Addis*

*v. Ltd. Long-Term Disability Program*, 425 F. Supp. 2d 610, 617 (E.D. Pa. 2006) ("[I]if [a]

consultant's conflicting opinion is based on reliable evidence, it can support a determination

contrary to that of a treating physician.").

As mentioned above, Defendant's decision finds significant support in the surveillance

video itself.  The video depicts activity levels inconsistent with a claim of total disability.

Surveillance is a legitimate investigatory tool used by plan administrators.  *Russell v. Paul*

*Revere Life Ins. Co.*, 288 F.3d 78, 81 (3d Cir. 2002).  Courts are reluctant to find a benefits

termination to be arbitrary and capricious where a surveillance video "indicates that a claimant's

physical limitations do not match either his own description of his limitation or the opinions of

his treating physicians."  *Eppley*, 789 F. Supp. 2d at 573.  The surveillance video of Plaintiff

shows him performing strenuous activities in his yard, including raking, digging, and mending a

fence.  He is seen bending, kneeling, walking, and lifting without any problems.  Although not dispositive of the question of whether or not he is capable of performing the sedentary occupation of computer programmer, the video does not support his claims of total disability and of an inability to sit and drive longer than ten minutes.  The surveillance video is part of a record that, when viewed as a whole, calls into serious question Plaintiff's claims.  Nothing contained in the Administrative Record, or in the initial termination letter or subsequent appeal denial letters, suggest that Defendant relied upon the surveillance video alone in terminating Plaintiff's disability benefits.  The surveillance video did, however, provide Defendant with additional proof to conclude Plaintiff did not meet the definition of "totally disabled" under the Plan, when viewed along with all of the available medical information.

Based upon the foregoing, it cannot be said that Defendant terminated Plaintiff's long-term disability benefits improperly.  The review by Defendant which included the opinions of three separate, independent physicians, demonstrates a thorough and thoughtful analysis of Plaintiff's claimed disability.  The Plan requires Plaintiff to submit sufficient proof of his disability to receive benefits.  (Admin. R. 72.)  Where a plan imposes the burden upon the claimant to substantiate his claims for disability benefits, and the claimant fails to provide competent proof, it is not unreasonable to terminate benefits.  *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 985 (3d Cir. 1991).  As discussed above, Defendant's conclusion that Plaintiff did not meet the definition of "totally disabled," as defined in the Plan, is supported by the reports of Drs. Haplea, Petrie, and Anfield, and is not contradicted by the majority of Plaintiff's treating physicians.  It is also supported by the surveillance video.  Defendant's conclusion that Plaintiff was not "totally disabled," as defined by the Plan, is based upon substantial evidence.  The decision was not arbitrary and capricious.

**C.      Additional Issues**

Since Plaintiff is acting *pro se* in this matter we will, out of an abundance of caution,

address several issues not discussed in the Parties' Briefs.

**1.      Structural Conflict**

*Metro Life Ins. Co. v. Glenn*, *supra*, compels an analysis as to whether a perceived

"conflict of interest" played a role in the termination of benefits.  554 U.S. at 111.  Where an

administrator both evaluates claims for benefits, and pays benefits claims, a conflict of interest

arises.  *Id*. (citing *Firestone*, 489 U.S. at 115).  The conflict is but one factor to be weighed in the

totality-of-the-circumstances.  It is not accorded any particular weight.  *Id*. at 117; *see also id*. at

127 (Scalia, J., dissenting).

Defendant both evaluated Plaintiff's claim for benefits, and is the entity that pays the

claim.  (Admin. R. 456-60, 465-68.)  It cannot be said, however, that this conflict of interest

played a role in Defendant's determination of Plaintiff's eligibility for benefits.  The

Administrative Record reveals an exhaustive, independent analysis on the part of Defendant in

evaluating Plaintiff's claim.  Defendant sought out the opinions of Plaintiff's treating physicians,

conducted three separate, independent in-person reviews of Plaintiff, and engaged three separate,

independent physicians to review Plaintiff's claims.  Furthermore, Defendant afforded Plaintiff

the opportunity to supplement the Administrative Record with additional medical evidence

supporting his claim of disability following the initial decision to terminate benefits.  Despite

ERISA not providing for a second appeal, Defendant gave Plaintiff the benefit of the doubt by

reviewing additional materials submitted by Plaintiff following the denial of his appeal.  Based

upon the numerous, active steps taken by Defendant to thoroughly and independently evaluate

Plaintiff's claim accurately, the conflict factor should not be afforded any weight in this analysis.

*See Glenn*, 554 U.S. at 117 (the conflict factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy"). We are satisfied that any perceived conflict on the part of Defendant cannot be said to tip the scales towards an abuse of discretion finding on the part of Defendant.

2.    *Procedural Factors*

The reasons set forth in Defendant's decision to terminate benefits present two issues that must be addressed.  Neither of the issues leads to a finding of abuse of discretion when viewed against the record as a whole.  First, the record, and Defendant's separate letters detailing its decision to terminate benefits and later uphold the decision, does not suggest that Defendant accounted for and distinguished the decision by SSA to award disability benefits.  A failure to account for an SSA determination of disability does not constitute *prima facie* abuse of discretion, but is one factor to consider in determining whether there was an abuse of discretion by failing to consider relevant evidence.  *Glenn*, 554 U.S. at 123-24 (Roberts, C.J., concurring in part and concurring in the judgment).  The Record here does not contain SSA's decision.  We cannot guess as to the reasoning and evidence behind the SSA's determination of disability.  However, Dr. Pushkarewicz was Plaintiff's primary treating physician at the time of the SSA decision in late 2002 (prior to the records of other treating providers suggesting Plaintiff's diagnosis to be uncertain).  It is not unreasonable to conclude that SSA's decision was based primarily upon Dr. Pushkarewicz's records.  The SSA is required to defer to the opinions of treating physicians such as Dr. Pushkarewicz, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Defendant is not required to defer.  *Nord*, 538 U.S. at 834.  Furthermore, nothing in ERISA requires Defendant to give deference to the decision of the SSA.  *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th. Cir. 2009) (citing *Glenn*, 554 U.S. at 134 (Scalia, J.,

25

dissenting)).  Given the timing of the SSA's decision, the subsequent availability of records of

additional treatment providers suggesting an uncertainty as to Plaintiff's diagnosis and disability,

and the thorough review by Defendant, which included the review by three separate physicians,

Defendant cannot be said to have abused its discretion in failing to account for SSA's decision.

A second issue concerns Defendant's initial termination letter of October 24, 2005,

wherein Defendant failed to address Dr. Pushkarewicz's diagnosis of arachnoiditis.  Typically,

"[a]n administrator's failure to address all relevant diagnoses in terminating a claimant's benefits

is [] a cause for concern that suggests the decision may have been arbitrary and capricious."

*Miller*, 632 F.3d at 853 (citing *Kobisa v. Merck & Co.*, 384 F.3d 58, 68-69 (3d Cir. 2004)).

However, any concern that Defendant failed to address the alleged diagnosis of arachnoiditis was

allayed by the subsequent letter of December 13, 2005.  In that letter, Defendant indicated to

Plaintiff that its independent physician consultant, Dr. Anfield, suggested that the diagnosis of

arachnoiditis was "not proven" due to a lacking of objective evidentiary support.  (Admin. R.

826.)  Moreover, Defendant indicated that regardless of a diagnosis of arachnoiditis, Dr. Anfield

indicated that arachnoiditis does not preclude activity including work, a finding consistent with

Dr. Pushkarewicz's prior indications.  (*Id.*; *see also id*. at 722-23, 818.)

The record here is replete with entries that Defendant was, at all times material, aware of

the alleged diagnosis of arachnoiditis.  Indeed, Defendant's independent medical examiner, Dr.

Haplea, addressed this diagnosis almost two years prior to the termination of benefits, and gave

the reasons why he believed Plaintiff's symptoms were inconsistent with such a diagnosis.  (*Id*.

at 792-93.)  The record viewed in its entirety suggests that Defendant fully considered this

diagnosis throughout its deliberative process.  This Defendant is required to do.  However,

nothing in ERISA suggests that Defendant was required to provide a detailed discussion of the

arachnoiditis diagnosis in its initial termination letter, particularly where, as here, the October 24, 2005 letter meets the requirements of Section 503 of ERISA, 29 U.S.C. § 1133.[10]  Defendant cannot be found to have acted arbitrarily and capriciously based upon the fact that the October 24, 2005 letter did not include a discussion of the arachnoiditis diagnosis.

   **D.   Additional Medical Records Submitted by Plaintiff Outside the Administrative Record**

   Plaintiff's chief complaint with regard to Defendant's termination of benefits is his perception that Defendant did not have the complete medical records of his treating physicians in arriving at its decision.  (Pl.'s Br. in Supp. of Mot. 8-10.)  This contention lacks merit. Defendant routinely endeavored to obtain the records of Plaintiff's treating physicians.  To the extent that any of the records received by Defendant from Plaintiff's treatment providers were not complete, Defendant cannot be faulted for a failure on the part of Plaintiff's physicians to forward complete sets of records.  Moreover, Plaintiff's complaints ring hollow in light of his own failure to supplement the Administrative Record with those medical records that he contends demonstrate his disability.  Following the initial decision to terminate benefits, Defendant invited Plaintiff to submit additional medical records evidencing his disability. Instead of forwarding new records evidencing his alleged disability, Plaintiff submitted his own self-serving narrative letters, records from Dr. Pushkarewicz previously received by Defendant, and a secondary source publication on arachnoiditis (the product of Plaintiff's prior internet

---

[10] Plaintiff does not argue that the content of the termination of benefits letter, dated October 24, 2005, constituted a violation of Section 503.  In any event, the October 24, 2005 letter meets the requirements set forth in Section 503, and the attending regulatory provision, 29 C.F.R. § 2560.503-1(f), by clearly setting forth the reasons for the decision to terminate benefits and the manner in which to appeal the decision.  *See Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 87 (3d Cir. 2009); *Syed v. Hercules, Inc.*, 214 F.3d 155, 162-63 (3d Cir. 2000).

research, *see ante* at 4).[11]  (Admin. R. 945-99.)  Despite not receiving any new medical evidence, Defendant went out of its way to engage additional independent review by a board certified physician, Dr. Anfield.  Only after receiving notice of the denial of his appeal did Plaintiff submit to Defendant additional medical evidence, namely the report from Dr. Argires, which Defendant did review even though it was not compelled to do so under ERISA.

We also permitted Plaintiff the opportunity to supplement the Administrative Record with those records he contended should have been included.  (ECF No. 42.)  Plaintiff failed to do so.  However, Plaintiff later submitted additional records, not part of the Administrative Record, along with his instant Motion.  (Def.'s Resp. to Pl.'s Mot. Ex. 1, ECF No. 50.)[12]  Certain of these records present some clarity as to why Plaintiff failed to supplement the Record while his claim was under administrative review.  After receiving notice of the initial termination decision, Plaintiff independently sought out the opinion of neurologist Dr. Margolies to support his claimed disability.  (Pl.'s Br. in Supp. of Mot. 8.)  As noted above, Dr. Margolies concluded that he saw "no reason why [Plaintiff] cannot go back to work to his previous job working with computers."  (Pl.'s Mot. Ex. 63.)  The conclusion of Dr. Margolies, outright refuting Plaintiff's claims of disability, was perhaps a reason not to supplement the Record with additional records during the administrative process.

Plaintiff was afforded every opportunity by Defendant and this Court to substantiate his claims of disability with medical evidence.  He failed to do so.  In the absence of medical

---

[11] As Defendant is not required to accord any special weight to the opinions of Plaintiff's treating physicians, Defendant cannot be said to be required to give any credence to purported secondary source materials researched on-line by Plaintiff.  *Nord*, 538 U.S. at 834.

[12] Exhibit "1" to Defendant's Response to Plaintiff's Motion provides an easy reference chart of the documents submitted by Plaintiff with his Motion, and identifies those documents which are not part of the Administrative Record.

evidence supporting Plaintiff's claimed disability, we will not disturb the decision of Defendant to terminate benefits.

**IV.     CONCLUSION**

Based upon the evidence presented in the Administrative Record, and the totality of the circumstances of Defendant's review, Defendant's decision to terminate Plaintiff's long-term disability benefits was neither arbitrary nor capricious.  Defendant's Motion for Summary Judgment will be granted, and Plaintiff's Motion will be denied.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**